UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:21-cv-00625-RJC-DCK

| WILLIAM BUTLER, | ) |
| :-- | :-- |
| Plaintiff, | ) |
| v. | ) |
| | ) **ORDER** |
| CITY OF CHARLOTTE, | ) |
| Defendant. | ) |

**THIS MATTER** is before the Court on the City of Charlotte's Motion for Summary Judgment (Doc. No. 13).

After nearly five and a half years in the United States Army, William Butler was hired as a police officer with the Charlotte-Mecklenburg Police Department. He was assigned to a patrol on third shift, which begins at night and lasts until morning. In his sixth year on the job, he asked to be reassigned to first shift, which starts in the morning and ends in the early afternoon. Citing his post-traumatic stress disorder, he said that working at night makes it harder for him to sleep, which in turn aggravates his disorder's symptoms.

CMPD rejected Butler's request, placing him instead in a temporary light-duty position in which he worked only daytime hours. The department eventually offered him seven jobs with the City of Charlotte, each of which would have meant a pay cut, a transition to civilian work, and the loss of retirement benefits. Butler refused all seven.

About nine months into Butler's temporary position, CMPD asked a third-party psychologist to evaluate his fitness for duty. After an evaluation, the psychologist declared in a written report that Butler is unfit for duty as a CMPD police officer. Referencing that report,

CMPD terminated Butler. Butler then sued the City of Charlotte, which operates CMPD, claiming that the City both discriminated and retaliated against him under the Americans with Disabilities Act.

Due to the lack of evidence supporting Butler's claims, the City is entitled to summary judgment. As explained below, the uncontradicted evidence shows that CMPD relied on the psychologist's unchallenged report to determine that Butler is unable to perform the essential functions of the job, even with a reasonable accommodation. And Butler has not shown that this legitimate, nonretaliatory reason was a pretext for retaliation. Accordingly, the City's Motion for Summary Judgment is **GRANTED**. The Court expresses the utmost respect for Butler's admirable efforts to treat his PTSD, and Butler is **COMMENDED** for his honorable service to our country.

**I.     BACKGROUND**

Before joining CMPD, Butler served as a logistics specialist in the Army, spending months on deployment in Afghanistan. Fitness for Duty Report 2 (May 26, 2020), Doc. No. 13-22 at 5. The base he was stationed on was nicknamed "Bomb City" because it was bombed and attacked with rockets on a daily basis. *Id.* Some of Butler's friends died in combat, and he "miraculously escaped injury" when a grenade exploded several feet from him. *Id.*

After over five years of military service, Butler was diagnosed with PTSD. Internal Affairs Mem. 2, Doc. No. 13-24 at 7; Reasonable Accommodation Request Questionnaire (Aug. 5, 2019), Doc. No. 13-16 at 2. Following his honorable discharge from the Army, was hired by CMPD as a police officer in April 2013. Internal Affairs Mem. 2, Doc. No. 13-24 at 7; Butler Résumé, Doc. No. 24-1; Butler Decl. ¶¶ 1–2, Doc. No. 24-3. Assigned to CMPD's Independence Division, he worked nights as a patrol officer on third shift (7:45 p.m. to 6:00 a.m.). Internal Affairs Mem. 2, Doc. No. 13-24 at 7; Def.'s Br. Supp. Mot. Summ. J. 3, Doc. No. 13-1.

2

Butler started experiencing sleep deprivation in 2018. Internal Affairs Mem. 2, Doc. No. 13-24 at 7. The next year, he received a department-wide email that encouraged officers with PTSD to seek help. *Id.* He told his supervisors about his PTSD and asked for an accommodation. *Id.* Specifically, in May 2019, he requested a transfer to first shift (5:45 a.m. to 2:00 p.m.). *Id.*; Email from Carl Johnson, Administrative Officer, CMPD Human Resources (May 20, 2019), Doc. No. 13-8 at 2; Def.'s Br. Supp. Mot. Summ. J. 3, Doc. No. 13-1.

In support of his request, Butler reported "an exacerbation" of his PTSD. Fitness for Duty Report 1, Doc. No. 13-22 at 4. He said his disorder "ha[d] worsened due to the cumulative effects of working nights for . . . several years and his inability to adapt to daytime sleep." *Id.*; *see also* Email from William Butler to Stephanie Guest, Employee Relations and Leave Supervisor, CMPD (Dec. 1, 2020), Doc. No. 20-21 at 1 ("[W]hen I originally came forward to seek help . . . I was struggling to hold myself together . . . .").

In a form that Butler filled out to request an accommodation, he said he was "struggling" with two essential functions of his job: Essential Function #3 and Essential Function #11. Email from Stephanie Guest, Employee Relations and Leave Supervisor, CMPD, to William Butler (Nov. 22, 2019), Doc. No. 13-19 at 8. Essential Function #3 requires CMPD police officers to "handle complex and stressful situations such as hostage negotiations, high risk arrests, suicide attempts, hazardous materials incidents and disaster scenes." CMPD Police Officer Essential Job Functions 1 (last updated Aug. 20, 2010), Doc. No. 13-2. It also requires officers to "[e]xercise independent judgment in determining when there is reasonable suspicion to detain, when probable cause exists to search and arrest[,] and when force may be used and to what degree." *Id.* Essential Function #11 requires officers to "[e]ngage in law enforcement patrol and investigative functions that include such things as working rotating shifts." *Id.* at 2. Other actions required by Essential Function #11

3

include "walking on foot patrol, running[,] and physically checking the doors and windows of buildings to ensure they are secure." *Id.*

After Butler submitted his accommodation request, Stephanie Guest, a CMPD employee-relations representative, began working with him. Internal Affairs Mem. 2, Doc. No. 13-24 at 7. In August 2019, Guest assigned Butler to a temporary light-duty position with the Financial Crimes Unit. *Id.*; Modified Duty Classification Form, Doc. No. 13-15. Butler worked in that position for at least fifteen months, working only during the day and making the same salary as before. Internal Affairs Mem. 3, Doc. No. 13-24 at 8; Email from Stephanie Guest to William Butler (Nov. 23, 2020), Doc. No. 13-19 at 35–36; CMPD Light-Duty Policy 1 (Sept. 19, 2017), Doc. No. 13-5; Pl.'s Resp. 2, Doc. No. 24 ("The [Financial Crimes Unit] position was a first shift position and satisfied [Butler's] accommodation request to be removed from third shift."). During that time, Guest offered Butler seven civilian jobs with the City. Emails from Stephanie Guest to William Butler (Nov. 12, 2019 to Nov. 23, 2020), Doc. No. 13-19 at 1, 14–15, 20, 25, 35–36. Butler rejected all seven, expressing discontent with the lower pay, the loss of retirement benefits, and the civilian nature of the work. Internal Affairs Mem. 3, Doc. No. 13-24 at 8.[1]

---

[1] Butler was offered jobs as a police investigative technician, a customer-service representative with animal control, a transportation administrative officer, an administrative officer with the fire department, a customer-service representative with the water department, a sanitation technician, and a police support technician. Emails from Stephanie Guest to William Butler (Nov. 12, 2019 to Nov. 23, 2020), Doc. No. 13-19 at 1, 14–15, 20, 25, 35–36. As a police officer, Butler made a salary of $63,433.24. Email from Stephanie Guest to William Butler (Nov. 22, 2019), Doc. No. 13-19 at 7. The jobs he was offered came with the following respective pay rates: $40,761 per year; $37,527 per year; $41,945 to $52,431 per year; $42,574 to $45,000 per year; $16.84 to $22.10 per hour; $16 per hour; and $44,850.52 per year. Emails from Stephanie Guest to William Butler (Nov. 22, 2019 to Nov. 23, 2020), Doc. No. 13-19 at 7, 15, 22, 28, 30, 33, 36.

4

While his accommodation request was pending, Butler sent CMPD letters from a psychiatrist and a completed questionnaire from a psychologist. He was seeing both at the Charlotte Veterans Affairs Health Care Center.

In his opening letter, the psychiatrist, Dr. Deepak Joshi, M.D., wrote that Butler "may be allowed to work during the first shift" to "better manage his mental health issues." Letter from Dr. Deepak Joshi (May 14, 2019), Doc. No. 20-5. A couple weeks later, Dr. Joshi explained in a second letter that "stress full [sic] situations like crowds or certain threats can trigger [Butler's] PTSD symptoms which in turn affects his work performance." Letter from Dr. Deepak Joshi (May 31, 2019), Doc. No. 20-6. Dr. Joshi further stated that "[p]er [Butler's] report the first shift . . . would be the least stressful schedule and would recommend that." *Id.*

After about six weeks, Dr. Joshi wrote another letter, relaying that Butler "had reported that the night time duty was very stressful" and that it "increas[es] his hyper vigilance and in turn caus[es] him to be fatigued and frustrated." Letter from Dr. Deepak Joshi (July 11, 2019), Doc. No. 20-7. Dr. Joshi also clarified that "the [f]itness for duty evaluation is beyond [his] scope of practice." *Id.*

Eight months later, Dr. Joshi wrote a fourth and final letter. It says that "[o]ccasional working at night is tolerated well by [Butler] but he prefers first shift as it helps better manage his symptoms." Letter from Dr. Deepak Joshi (March 10, 2020), Doc. No. 20-10. Those symptoms were identified as hypervigilance, anxiety, and paranoia. *Id.* Dr. Joshi again stated that "any specific details regarding [Butler's] work as a police officer is beyond the scope of [Dr. Joshi's] practice." *Id.*

The psychologist at the Veterans Affairs Center, Dr. Angela Gonzalez-Gonyer, Psy.D., sent CMPD a completed questionnaire about Butler's condition. The questionnaire was submitted

5

as part of Butler's accommodation request. Dr. Gonzalez-Gonyer did not represent that she was providing an opinion about Butler's fitness for duty, nor did she indicate that the scope of her practice includes fitness-for-duty evaluations.

In the questionnaire, Dr. Gonzalez-Gonyer stated that "PTSD affects . . . Butler's quality/quantity of sleep." Reasonable Accommodation Request Questionnaire (Sept. 17, 2019), Doc. No. 20-8 at 2. She specified that working third shift "substantially affects [Butler's] ability to sleep." *Id.* In turn, the difficulty sleeping "affects several areas of functioning: judgment, concentration, hypervigilance, [and] irritability." *Id.*

Dr. Gonzalez-Gonyer wrote that Butler would "be most effective on [first] shift," which "should be less stressful to him." *Id.* She reported that the second and third shifts make Butler "more guarded, hypervigilant, and less focused due to the element of 'darkness.'" *Id.*[2] Dr. Gonzalez-Gonyer recommended a transfer to first shift "in an effort to [help Butler] develop more healthy sleep patterns," and she explained that "[a] permanent transfer would be most beneficial to . . . Butler's health [and] well-being." *Id.*, Doc. No. 20-8 at 3.

Dr. Gonzalez-Gonyer's questionnaire identified two essential job functions that Butler "cannot perform or is limited in performing." *Id.*, Doc. No. 20-8 at 2. They were the same functions that Butler said he was struggling with: Essential Function #3 (requiring officers to "handle complex and stressful situations") and Essential Function #11 (requiring officers to "work[] rotating shifts"). CMPD Police Officer Essential Job Functions 1–2 (last updated Aug. 20, 2010), Doc. No. 13-2; *see* Reasonable Accommodation Request Questionnaire, Doc. No. 20-8 at 2.

---

[2] In one of his letters, Dr. Joshi explained that "[t]he element of darkness" refers to "working at night time." Letter from Dr. Deepak Joshi (March 10, 2020), Doc. No. 20-10.

6

About nine months after Butler began his light-duty position with the Financial Crimes Unit, Guest asked Dr. Peter Summers, a licensed psychologist, to evaluate Butler's fitness for duty. Fitness for Duty Report 1, 4 (May 26, 2020), Doc. No. 13-22 at 4, 7. At the time, CMPD had "no concerns about [Butler's] performance, behavior, emotional stability, or demeanor." *Id.* at 1, Doc. No. 13-22 at 4. Still, "in light of [Butler's] self-reported concerns," the department "thought it prudent" to have him evaluated. *Id.*

To assess Butler's fitness for duty, Dr. Summers conducted a clinical interview and a mental status examination. *Id.* at 2, Doc. No. 13-22 at 5. The psychological testing included the Symptom Checklist 90-Revised and the Minnesota Multiphasic Personality Inventory-2-RF. *Id.* Dr. Summers reviewed referral information along with Butler's medical records, which were obtained from his therapist and psychiatrist. *Id.* at 2–3, Doc. No. 13-22 at 5–6.

Butler presented relatively normally during the evaluation, though "deep weariness and strain were evident" at times. *Id.* at 2, Doc. No. 13-22 at 5. Butler told Dr. Summers that his "military experiences" gave him "a chronic, though waxing and waning, psychiatric condition." *Id.* Butler "first sought treatment in 2013," and he "spent nearly two years working successfully with a therapist." *Id.* During that time, "his symptoms largely remitted," and "he felt 'like [he] was in a good place.'" *Id.* (alteration in original). But "his progress . . . steadily eroded over the past several years." *Id.* His condition worsened due to "insufficient sleep, working in the nighttime, and being exposed to murders, suicides, and other graphic scenes, all of which trigger traumatic memories and significantly exacerbate his symptoms." *Id.* Butler "resumed treatment in 2018" and since then has seen "a therapist and a psychiatrist for medication management." *Id.* He said he noticed "an improvement in his symptoms" after he began working with the Financial Crimes Unit. *Id.*

Despite this reported progress, Butler told Dr. Summers that he "is convinced that his symptoms will remain unmanageable as long as he consistently works nights." *Id.* He also "worries" about "his ability to continue functioning effectively and safely as a patrol officer on third shift." *Id.* Though he thinks he could "tolerate occasionally working nights or evenings," he believes he should "work[] primarily during the day." *Id.*

Following the evaluation, Dr. Summers wrote a report that summarizes his findings and announces his medical opinion. In the report, Dr. Summers concludes that Butler "is not fit for duty in his position as a police officer with the Charlotte-Mecklenburg Police Department at this time." *Id.* at 3, Doc. No. 13-22 at 6. Dr. Summers's conclusion is "[b]ased on the current evaluation" as well as Dr. Summers's "education and training." *Id.* It is founded on "a reasonable degree of medical and scientific certainty." *Id.*

The results of the evaluation suggest that Butler "has been experiencing clinically significant and persistently acute symptoms associated with a chronic psychiatric condition for quite some time." *Id.* Dr. Summers found that Butler "continues to manifest" a number of specific symptoms: "high anxiety, hypervigilance, paranoia, mood instability (depression, irritability, anger), avoidant behavior, intrusive thoughts, nightmares, and flashbacks." *Id.* Additionally, Butler's paranoia produces "a pervading sense that 'everyone is out to get [him]' and fear of the uncertainties inherent to patrol duty." *Id.* (alteration in original).

Dr. Summers explained that Butler's "symptoms are hindering his ability to effectively and reliably perform his full duties as a patrol officer." *Id.* at 3, Doc. No. 13-22 at 6. Butler's symptoms—particularly his "heightened anxiety, avoidance, intrusive thoughts, hypervigilance, and paranoia"—are "likely to interfere" with "whether and how he responds to calls," his "situational awareness," his "judgment," how he engages in "decision-making," and, more

8

generally, his "reactions to varying situational factors." *Id.* Additionally, Butler's "difficulty getting adequate, restorative sleep adversely impacts his ability to work rotating or alternate shifts, as well as his concentration and focus." *Id.*

Dr. Summers wrote that, despite efforts to "manage his symptoms," Butler is "admittedly vulnerable to the inherent stressors of serving as a patrol officer, especially working nights." *Id.* Butler's medical records "partially" support his "contention that his symptoms have been less intense and less difficult to manage since he has been working a temporary assignment" with the Financial Crimes Unit. *Id.* "[H]owever," Dr. Summers explained that Butler's medical records "are also consistent with" another conclusion: "that his symptoms remain acute and his condition vulnerable and unstable." *Id.* The latter conclusion is further supported by "current test results," Butler's "self-report," and his "demeanor." *Id.*

Ultimately, Butler's "return to full fitness for his position will hinge on his progress in treatment." *Id.* Thus, Dr. Summers could give "no estimated time frame" for when Butler might become fit for duty. *Id.*

Dr. Summers's office sent the fitness-for-duty report to CMPD. Internal Affairs Mem., Doc. No. 13-24 at 10. Based on the report, CMPD determined in early 2021 that Butler is "unable to perform the essential job functions required in his position." Internal Affairs Mem., Doc. No. 13-24 at 10; *see* CMPD Chain of Command Review Board Form, Doc. No. 13-24 at 3; Notice of Final Decision, Doc. No. 13-25. Butler was ultimately terminated for violating CMPD Rule of Conduct 5B, which concerns unsatisfactory performance. *Id.* Under that rule, unsatisfactory performance includes "the physical or mental inability to perform the essential functions of the position and required duties." CMPD Rules of Conduct (June 4, 2020), Doc. No. 13-7 at 7.

9

Butler sued the City, asserting a disability-discrimination claim and a retaliation claim under the Americans with Disabilities Act (ADA). Compl. ¶¶ 37–51, Doc. No. 1.

## II. STANDARD OF REVIEW

A court will grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) ("Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."). A fact is material only if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). The moving party may carry its burden by showing "an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." *Id.* at 322 n.3. The nonmoving party may not rely on "the mere allegations or denials of [its] pleading" to defeat a motion for summary judgment. *Id.* Rather, the nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict" in its favor. *Anderson*, 477 U.S. at 248; *accord Sylvia Dev. Corp. v. Calvert Cnty.*, 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a motion for summary judgment, a court must view the evidence and any inferences from it in the light most favorable to the nonmoving party. *Sylvia*, 48 F.3d at 817. The mere argued existence of a factual dispute does not defeat an otherwise properly supported motion. *Anderson*, 477 U.S. at 249. And if the nonmoving party's evidence is merely colorable, or is not significantly probative, summary judgment is appropriate. *Id.* at 249–50.

## III. DISCUSSION

### A. Disability-Discrimination Claim

The ADA prohibits an employer from discriminating against "a qualified individual on the basis of disability" when making "hiring, advancement, or discharge" decisions. 42 U.S.C. § 12112(a). A "qualified individual" is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position." *Id.* § 12111(8); *see Elledge v. Lowe's Home Ctrs.*, LLC, 979 F.3d 1004, 1009 (4th Cir. 2020).

Unlawful discrimination includes an employer's "failure to make 'reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability.'" *Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 344 (4th Cir. 2013) (quoting 42 U.S.C § 12112(b)(5)(A)). Butler employs that theory here, claiming that CMPD discriminated against him by failing to offer him a reasonable accommodation. Pl.'s Resp. 7, Doc. No. 24.

To make a prima facie case under that theory, Butler must satisfy four elements. First, he must show that he was "an individual who had a disability within the meaning of the statute." *Wilson*, 717 F.3d at 345. The parties do not dispute that Butler had a qualifying disability. Second, Butler must show that CMPD "had notice of his disability." *Id.* That is not disputed either. To satisfy the third element, Butler must show that he "could perform the essential functions of the position" with a "reasonable accommodation." *Id.* And, for the fourth element, he must show that

11

CMPD "refused to make such accommodations." *Id.* The parties dispute both Butler's ability to perform the essential functions of the job and whether CMPD offered him a reasonable accommodation.

CMPD based its decision to terminate Butler on Dr. Summers's report, which declared Butler unfit for duty. Internal Affairs Mem., Doc. No. 13-24 at 10; CMPD Chain of Command Review Board Form, Doc. No. 13-24 at 3. The department concluded from the report that Butler is "unable to perform the essential job functions required in his position as a police officer." Internal Affairs Mem., Doc. No. 13-24 at 10; *see* CMPD Chain of Command Review Board Form, Doc. No. 13-24 at 3. As explained below, Dr. Summers's report supports that conclusion, and Butler has produced no evidence to refute it.

When courts identify a job's essential functions, "consideration shall be given to the employer's judgment." 42 U.S.C. § 12111(8). And "if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." *Id.* The essential functions of a CMPD police officer are listed in a job description that was written before Butler's time with CMPD. *See* CMPD Police Officer Essential Job Functions (last updated Aug. 20, 2010), Doc. No. 13-2.

As mentioned above, one of the essential functions of a CMPD police officer, Essential Function #3, is the ability to "handle complex and stressful situations." *Id.* Examples of such situations include "hostage negotiations, high risk arrests, suicide attempts, hazardous materials incidents and disaster scenes." *Id.* Essential Function #3 also requires officers to "[e]xercise independent judgment" in certain situations. *Id.* Specifically, independent judgment must be exercised in "determining when there is reasonable suspicion to detain, when probable cause exists to search and arrest[,] and when force may be used and to what degree." *Id.*

12

Butler told Guest that he was "struggling" with Essential Function #3. Email from Stephanie Guest to William Butler (Nov. 22, 2019), Doc. No. 13-19 at 8. The reasons for that struggle were explained by Dr. Summers in his report. After examining Butler, Dr. Summers found that Butler's "symptoms are hindering his ability to effectively and reliably perform his full duties as a patrol officer." Fitness for Duty Report 3 (May 26, 2020), Doc. No. 13-22 at 6. Relevant to Essential Function #3, Dr. Summers determined that Butler's "heightened anxiety, avoidance, intrusive thoughts, hypervigilance, and paranoia" are "likely to interfere" with his "reactions to varying situational factors." *Id.* Butler's symptoms could affect "whether and how he responds to calls," his "situational awareness," his "judgment," and how he engages in "decision-making." *Id.* Additionally, Butler's condition worsens when he is "exposed to murders, suicides, and other graphic scenes, all of which trigger traumatic memories and significantly exacerbate his symptoms." *Id.* at 2, Doc. No. 13-22 at 5.

Dr. Summers reported that Butler continuously experiences "clinically significant and persistently acute symptoms" that make him "vulnerable to the inherent stressors of serving as a patrol officer." Fitness for Duty Report 3 (May 26, 2020), Doc. No. 13-22 at 6. Thus, even if Butler got his preferred accommodation and worked only first shift, Dr. Summers's report supports CMPD's conclusion that he would still be unable to cope with the inherently complex and stressful demands of police work—a reality of the work at any time of day. Indeed, Butler's "current test results, his self-report, and demeanor . . . indicate that his symptoms remain[ed] acute and his condition vulnerable and unstable" even after he had worked for approximately nine months in the light-duty position with the Financial Crimes Unit—a job that required him to work only during the day. *Id.* So Dr. Summers's report supports the conclusion that an assignment to first shift would not have enabled Butler to perform Essential Function #3. Rather, according to Dr. Summers, the

13

only remedy for Butler's ongoing symptoms would be an indefinite amount of treatment and time—two things beyond the scope of any "reasonable accommodation" CMPD could provide. *See id.* ("[Butler's] return to full fitness for his position will hinge on his progress in treatment; consequently, no estimated time frame for this can be made.").

Butler also expressed difficulty performing Essential Function #11, which required him to "work[] rotating shifts." CMPD Police Officer Essential Job Functions 2 (last updated Aug. 20, 2010), Doc. No. 13-2; *see* Email from Stephanie Guest to William Butler (Nov. 22, 2019), Doc. No. 13-19 at 8. Dr. Summers identified the cause of that struggle: Butler's "inability to adapt to daytime sleep." Fitness for Duty Report 1 (May 26, 2020), Doc. No. 13-22 at 4. Dr. Summers explained that Butler's "difficulty getting adequate, restorative sleep adversely impacts his ability to work rotating or alternate shifts." *Id.* at 3, Doc. No. 13-22 at 6. That difficulty makes Butler "vulnerable to the inherent stressors of serving as a patrol officer, especially working nights." *Id.* Butler's inability to sleep during the day, combined with the "effects of working nights for . . . several years," caused his PTSD to "worsen[]." *Id.* at 1, Doc. No. 13-22 at 4. And, starting in 2018, this worsened condition caused him to begin suffering from sleep deprivation. Internal Affairs Mem. 2, Doc. No. 13-24 at 7.

Butler's proposed solution was for CMPD to take him off third shift and assign him to first shift. But that would just eliminate the rotating-shift requirement in Essential Function #3, not help Butler perform it. During his fitness-for-duty evaluation, Butler told Dr. Summers that he "worries" about "his ability to continue functioning effectively and safely as a patrol officer on third shift." *Id.* at 2, Doc. No. 13-22 at 5. And he said he "is convinced that his symptoms will remain unmanageable as long as he consistently works nights." *Id.* Yet consistently working nights

14

on third shift could be required by Essential Function #11. Thus, "no reasonable accommodation" would have "allowed [Butler] to perform [this] essential function[]." *Elledge*, 979 F.3d at 1013.

Dr. Summers's report supports CMPD's conclusion that Butler is unable to perform the essential functions of a police officer's job, even with a reasonable accommodation. In the face of that report, Butler has done nothing to carry his evidentiary burden. He produces no evidence (such as a second opinion) to rebut the report. He does not even challenge the validity of the report or the soundness of Dr. Summers's conclusions. *See* Pl.'s Resp. 17, Doc. No. 24 (discussing Dr. Summers's report without challenging it).[3]

In short, Butler offers no evidence to satisfy his "burden of demonstrating that [he] could perform the essential functions of [his] job with reasonable accommodation." *Tyndall v. Nat'l Educ. Ctrs., Inc. of Cal.*, 31 F.3d 209, 213 (4th Cir. 1994). There is thus "an absence of evidence to support [Butler's] case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).[4] Accordingly, "the

---

[3] Dr. Summers's report is not contradicted by Dr. Joshi's letters or Dr. Gonzalez-Gonyer's reasonable-accommodation questionnaire. Dr. Joshi and Dr. Gonzalez-Gonyer never claimed to offer an opinion about Butler's fitness for duty, and no fitness-for-duty evaluation was conducted by them. And Dr. Joshi specifically denied that he was offering an opinion on Butler's fitness for duty, emphasizing that "any specific details regarding [Butler's] work as a police officer is beyond the scope of [his] practice." Letter from Dr. Deepak Joshi (March 10, 2020), Doc. No. 20-10; *see also* Letter from Dr. Deepak Joshi (July 11, 2019), Doc. No. 20-7 ("[T]he [f]itness for duty evaluation is beyond my scope of practice.").

[4] *See Reynolds v. Am. Nat'l Red Cross*, 701 F.3d 143, 154 (4th Cir. 2012) (explaining that "[e]vidence of all [the] elements" of an ADA claim "is necessary to survive summary judgment"); *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (explaining parenthetically that, "once [a] motion for summary judgment is properly made and supported, [the] opposing party bears [the] burden of showing, by means of affidavits or other verified evidence, that [a] genuine dispute of material fact exists" (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986))); *Sedar v. Reston Town Ctr. Prop., LLC*, 988 F.3d 756, 761 (4th Cir. 2021) ("[T]he mere existence of a scintilla of evidence in favor of the non-movant's position is insufficient to withstand the summary judgment motion. Likewise, conclusory allegations or denials, without more, are insufficient to preclude granting the summary judgment motion." (citations and internal quotation marks omitted)).

15

evidence could not permit a reasonable jury to return a favorable verdict" for Butler on his disability-discrimination claim. *Sedar*, 988 F.3d at 761.

### B. Retaliation Claim

The ADA prohibits an employer from retaliating against an employee because he "opposed" conduct that is unlawful under the ADA or because he "made a charge, testified, assisted, or participated" in an ADA-related "investigation, proceeding, or hearing." 42 U.S.C. § 12203(a). To establish a prima facie case of retaliation, a plaintiff must prove three elements. *Reynolds v. Am. Nat'l Red Cross*, 701 F.3d 143, 154 (4th Cir. 2012). He first must show that he engaged in "protected conduct." *Id.* He must then identify an "adverse action" that he suffered. *Id.* And for the final element, he must show a "causal link" between the protected conduct and the adverse action. *Id.* To assert a retaliation claim, a plaintiff must "either offer sufficient direct and indirect evidence of retaliation, or proceed under a burden-shifting method." *Rhoads v. Fed. Deposit Ins. Corp.*, 257 F.3d 373, 391 (4th Cir. 2001); *see also Staley v. Gruenberg*, 575 F. App'x 153, 155 (4th Cir. 2014) (per curiam).

Butler says he engaged in protected activity on two occasions. *See* Pl.'s Resp. 20–21, Doc. No. 24.[5] The first was during a meeting with the Chief of Police on June 10, 2020, when Butler

---

[5] In his Complaint, Butler initially alleged that CMPD retaliated against him when it "subjected him to a medical examination," Compl. ¶ 1, Doc. No. 1, when it selected him for "a urinalysis examination to test for illegal substances" (which came back negative), *id.* ¶ 28, when it gave him an "ultimatum" involving a "much lower paying position," *id.* ¶ 30, and when it "refused to assign him to a first shift position with the same pay and benefits," *id.* ¶ 47. Butler's summary-judgment brief makes no argument that those four actions were retaliatory. He has therefore waived any retaliation claim based on those actions. *See Lisa Teresa S. v. Kijakazi*, 2022 WL 3269955, at *3 n.5 (E.D. Va. July 26, 2022) ("Plaintiff's failure to develop arguments regarding these contentions waives any claim involving them."); *Hughes v. B/E Aerospace, Inc.*, 2014 WL 906220, at *1 n.1 (M.D.N.C. Mar. 7, 2014) ("A party should not expect a court to do the work that it elected not to do."); *Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017) ("A party waives an argument by failing to present it in its opening brief or by failing to develop its argument—even if

said he "felt that [he] had been discriminated against." Butler Decl. ¶ 4, Doc. No. 20-3. The second was on December 1, 2020, when Butler told Guest in an email that he had experienced "discrimination during [the reasonable-accommodation] process." Email from William Butler to Stephanie Guest, Employee Relations and Leave Supervisor, CMPD (Dec. 1, 2020), Doc. No. 20-21 at 2.

Referencing Dr. Summers's fitness-for-duty report, CMPD cited Butler for unsatisfactory performance on December 29, 2020. *See* CMPD Internal Affairs Mem. (Dec. 29, 2020), Doc. No. 13-24 at 10. That citation, which is the adverse action identified by Butler, *see* Pl.'s Resp. 20–21, Doc. No. 24, was handed down over six months after Butler's meeting with the Chief of Police. Such a long interval does not raise any inference of causal connection. *See Horne v. Reznick Fedder & Silverman*, 154 F. App'x 361, 364 (4th Cir. 2005) ("[T]his court has previously noted that a lapse of two months between the protected activity and the adverse action is 'sufficiently long so as to weaken significantly the inference of causation.'" (quoting *King v. Rumsfeld*, 328 F.3d 145, 151 n.5 (4th Cir. 2003))); *Wilson v. City of Gaithersburg*, 121 F. Supp. 3d 478, 485 (D. Md. 2015) ("[M]ore than three months passed between Plaintiff's last protected action and the termination of his employment, too long a period for Plaintiff to establish a causal relationship on temporal proximity alone.").[6]

Even if the temporal proximity between the email to Guest and the citation could satisfy Butler's prima facie case and shift the burden of production to CMPD, the department has

---

its brief takes a passing shot at the issue." (internal quotation marks and alterations omitted)).

[6] An attorney representing Butler sent CMPD a message on December 5, 2019. *See* Email from Nicole Haynes, Van Kampen Law PC (Dec. 5, 2019), Doc. No. 20-22. That communication—sent a year before Butler was cited for unsatisfactory performance—cannot raise a causal inference based on temporal proximity.

17

articulated a legitimate, nonretaliatory reason for issuing the citation. *See Rhoads*, 257 F.3d at 392. Based on Dr. Summers's conclusion that Butler is not fit for duty, CMPD cited him for unsatisfactory performance under CMPD Rule of Conduct 5B, Internal Affairs Mem., Doc. No. 13-24 at 10, a rule that defines "unsatisfactory performance" in part as "the physical or mental inability to perform the essential functions of the position and required duties," CMPD Rules of Conduct (June 4, 2020), Doc. No. 13-7 at 7. Butler offers no evidence that CMPD used Dr. Summers's report as a pretext for retaliation. *See Staley v. Gruenberg*, 575 F. App'x 153, 156 (4th Cir. 2014) (per curiam). Indeed, as explained above, Butler does not even challenge the soundness of Dr. Summers's conclusions. In support of his retaliation claim, he appeals only to temporal proximity. *See* Pl.'s Resp. 20, Doc. No. 24. But at the pretext stage, temporal proximity alone is insufficient. *See Staley*, 575 F. App'x at 156 (stating that "temporal proximity alone is not sufficient to establish that [a plaintiff's] engagement in protected activity was a 'but for' cause" of the adverse action (citing *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 660 (5th Cir. 2012))); *David v. Winchester Med. Ctr.*, 2018 WL 310140, at *20 (W.D. Va. Jan. 5, 2018) (ruling that, although "temporal proximity is sufficient to establish causation for [a plaintiff's] prima facie case," temporal proximity alone cannot establish causation "at the pretext stage" (first citing *Staley*, 575 F. App'x at 156; then citing *Hernandez*, 670 F.3d at 660)).

Finally, considering Butler's retaliation claim outside the burden-shifting framework, Butler offers no "direct evidence of a stated purpose to [retaliate]," and the "indirect evidence" he points to—temporal proximity alone—is not "of sufficient probative force to reflect a genuine issue of material fact." *Rhoads*, 257 F.3d at 391 (alteration omitted); *see Strong v. Univ. Healthcare Sys., L.L.C.*, 482 F.3d 802, 807–08 (5th Cir. 2007) (explaining that "summary judgment in favor of the defendant [is] proper" when the defendant "state[s] legitimate,

18

nondiscriminatory reasons for firing the plaintiff" and the plaintiff offers only "timing allegations" (quoting *Roberson v. Alltel Info. Servs.*, 373 F.3d 647, 656 (5th Cir. 2004))); *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999) (en banc) ("Generally, more than a temporal connection between the protected conduct and the adverse employment action is required to present a genuine factual issue on retaliation.").[7]

## IV. CONCLUSION

**IT IS, THEREFORE, ORDERED** that:

1. The City's Motion for Summary Judgment (Doc. No. 13) is **GRANTED**.

2. The Clerk is directed to close this case.

Signed: August 8, 2023

Robert J. Conrad, Jr.
United States District Judge

---

[7] The declaration that Butler filed, *see* Butler Decl., Doc. No. 24-3, provides no evidence of retaliation. Although officials from Internal Affairs questioned Butler about his "request for reasonable accommodations and [his] PTSD diagnosis," *id.* ¶ 6, he was not questioned about his protected activity—the disclosures he made to Guest and the Chief of Police regarding his belief that he had experienced discrimination.

19